# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| A.R., by and through his Parents, P.R. and J.R., <br><br>  Plaintiffs, <br><br> v. <br><br> CAPE HENLOPEN SCHOOL DISTRICT, <br><br>  Defendant. | Civil Action No. 1:21-cv-00146-TLA |

## Memorandum

Plaintiff A.R., by and through his parents P.R. and J.R., brought this civil action against the Cape Henlopen School District ("District"). A.R. alleges that, when he was in elementary school, the District failed to provide him a free appropriate public education ("FAPE"), in violation of § 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*.

As required by the RA, the parties first had an administrative hearing before an impartial hearing officer, who ruled for the District. Having exhausted that administrative remedy, A.R. and his parents filed their complaint in the District Court for the District of Delaware. The parties then cross-moved for judgment on the administrative record. For the reasons explained below, I grant the District's motion, deny A.R.'s cross-motion, and enter judgment in the District's favor.

## I.

**Factual Background**

A.R., now in middle school, previously attended H.O. Brittingham Elementary School within the District. R 272.[1] Plaintiffs, P.R. and J.R. ("Parents"), are A.R.'s parents and natural guardians. Defendant District is a recipient of federal funds and is designated as a Local Educational Agency by Delaware law and the Delaware Department of Education.

At all relevant times, A.R. was recognized as a protected disabled student with Attention Deficit/Hyperactivity Disorder, Stereotypic Movement Disorder, and Social (Pragmatic) Communication Disorder under § 504 of the RA. R 739. Because of his disabilities, he has speech and language issues, poor strength and motor skills, and social-skills deficits. His disability-related behaviors include awkward movements, hand-wringing, flapping, and bunching up clothing; scripted speech; hyperactivity; inattention/lack of focus; difficulty understanding others' perspectives; and "perseveration" on topics not of interest to same-aged peers. D.I. 28 at 1, R 1097-98. In and out of school, he has been in speech and language therapy, occupational therapy, physical therapy, and a social-skills group. R 67, 104-13, 764, 778.

The District provided A.R. with various services and aids to accommodate his disabilities. It crafted an Individualized Education Program ("IEP"), under which he received speech and language therapy services from preschool until third grade. R 114-19,

---

[1] References are to the administrative record filed October 6, 2021 (D.I. 21).

123-35, 143-52, 158-64, 175-83, 220-35, 249-71. His IEP noted that Parents were concerned that the unintelligibility of A.R.'s speech would create problems with "peers from a social standpoint," so the speech services were targeted toward articulation. R 256, 262.

Meanwhile, A.R. attended school and experienced some bullying from his peers. He states he was a victim of severe bullying about which the District knew since at least first grade. A.R. Br. at 3. It responds that it was "aware of isolated incidents at recess and students teasing [A.R.]" but that "these interactions did not constitute persistent or widespread bullying warranting implementation of" a comprehensive anti-bullying plan. District Br. at 18. Although the parties dispute the characterization of the incidents as either serious bullying or minor teasing, the facts of what A.R. experienced and what the school knew are in the record and not in dispute.

The record shows the school knew about the following incidents during the first grade (2015-2016) school year:

1. On November 30, 2015, Parents emailed District staff to tell them that two other students, R. and B.,[2] were "throwing acorns at [A.R.] and chasing him at recess," "stepping on him," and "saying mean things." R 50.

    - A.R.'s teacher responded that the recess monitors would keep an eye out for him and guide him to join other kids when they saw he was by himself. R 51. She said the monitors would also watch out for the two students who threw the acorns "to be sure that we're treating one another with kindness." R 51. Finally, she said she would work on team activities and community bonding with the class to help them better support one another when out at recess. R 51.

    - Parents later said that the issues on the playground "seemed to improve." R 55.

---

[2] Students involved in bullying incidents are referenced by their first initial.

3

2. On December 2, 2015, Parents emailed District staff to tell them that student J. "was punching [A.R.] in his stomach" while waiting for the bus and while on the bus. R 52-53. There is no response to this email included in the record.

Next, the record shows the school knew about the following incidents during the second grade (2016-2017) school year:

3. On November 15, 2016, Parents emailed District staff to inform them that another student B. was "teasing/chasing [A.R.] and getting other kids to do it as well waiting for the bus in the afternoon and in the playground." R 54.

   o A.R.'s teacher responded that she "talked with B[.] about his behavior and had him talk with [A.R.] to work this out." R 55. She asked Parents to "[p]lease let [her] know if this continues." R 55.

4. On January 17, 2017, the school's Assistant Principal emailed Parents saying that (1) she had looked into concerns that girls were pushing A.R. at recess, (2) the recess aides will keep a close eye on him, and (3) she will check in periodically with him about recess. R 56.

   o Parents responded by thanking the Assistant Principal and offering to volunteer for playground duty. R 57.

5. On April 10, 2017, another student "shoved [A.R.] with his shoulder at the end of art class." R 335.

   o Teachers notified Parents of the incident, and the offending student received a three-day out-of-school suspension. R 335.

Overall, the record contains evidence of five incidents of minor bullying (such as name-calling and physical altercations that did not result in injury) spread over the span of these two school years. For four out of the five incidents, A.R.'s teachers or assistant principal responded with a plan to prevent the incidents from recurring, such as having recess monitors look out for A.R., speaking directly with the bully, or disciplining the bully. For playground teasing, Parents admitted things had seemed to improve.

Toward the end of second grade, Parents met with District staff to discuss A.R.'s eligibility for additional services. In an evaluation conducted in preparation for the meeting, A.R. scored "within the average range" on a test designed to assess his "social competence and behavioral/emotional functioning within the school environment." R 214. But Parents shared "concerns about the teasing." R 204. As a result, the District decided to implement a "token system" to allow A.R. to talk to an adult when he had concerns about teasing and to work on "self-advocacy skills." R 204. Parents and staff also discussed A.R.'s issues with organization and handwriting, so the District amended his IEP to include occupational therapy to help A.R. with organization strategies, handwriting, and shoe tying in the classroom. R 266.

In third grade, the District performed an evaluation to see if A.R. met the criteria for accommodations under § 504 of the RA. R 272-86. While an IEP covers a narrow provision of services like speech therapy and occupational therapy, a 504 Plan covers broader changes the school can make to a student's learning environment to provide support and remove barriers that might inhibit the student from learning alongside his peers. A.R.'s 504-eligibility evaluation included reports from Parents and teachers, an interview of A.R. by the school psychologist, and a review of his medical records, grades, and test scores. R 273-80. In it, Parents expressed concern that, among other things, A.R. "is the last to be picked for teams." R 274. He self-reported that he feels he "[a]nnoy[s] other people." R 274. The evaluator noted that he "struggles in peer relationships." R 275. Yet bullying was nowhere mentioned in the 504 evaluation—not by Parents, teachers, or A.R. And the bulk of the evaluation focused on his "frequent inattentive behaviors such

as starting and stopping a task without completing it, giving up easily and requiring extra support to understand and follow directions." R 275.

The evaluator recommended various supports to help A.R. stay on task, including giving positive reinforcement based on how long he remained on task and using cues to remind him to get back on task when distracted. R 281. She also provided recommendations for social-skills development, like providing A.R. with assertiveness training and rearranging classroom seating to put him next to someone who may become a friend. R 282-83.

Ultimately, the District instituted a 504 Plan for A.R. The 504 Plan contained only some recommendations in the eligibility screening. R 287-93. It included almost all the supports to keep A.R. on task but only included one social-skills support—pairing him with a "[p]eer model/buddy." R 288-89.

**The October 2018 Bullying Incident and District's Response**

In October 2018, when A.R. was in fourth grade, he experienced a severe bullying incident. R 80, 83. A group of students, led by ringleader student K., surrounded A.R. at recess while kicking and insulting him. R 83. The incident was so severe that another student who witnessed it immediately reported it to the teachers. R 83. A.R.'s teacher, Holly Grandfield, initially responded by sending him on an errand outside the classroom and holding a "class meeting" to address the incident. R 83. She required all the other students to write notes to "apologize and/or tell how they will be his friend going forward from today." R 83. Grandfield emailed Parents about the incident and then put the apology notes in A.R.'s backpack. Some notes were nice, but others were rude. *See, e.g.*, R 298

6

another class that would have structured conversation and extra adults present; (2) he had the option to leave recess and go to the main office for a leadership job; (3) he would be given natural social-skills opportunities in extracurricular activities such as volleyball, Odyssey of the Mind, and Cub Scouts; (4) he would receive social-skills services; (5) the school psychologist would meet with him for weekly check-ins; (5) the school would assign him a peer buddy at recess; and (6) it included additional miscellaneous supports. After the school restricted the bully K. and provided more support to A.R., he did much better socially. R 640-43, 644-67, 990-91, 1019-24. He had several friends and would socialize and engage with his peers at recess, lunch, and other times. R 640-43, 674-75, 901, 988-90. Other than one negative interaction with K. shortly after the safety plan went into place (which the school addressed quickly by separating the students and disciplining K.), there was no repeat bullying reported to the school. *See* R 98, 336, 875 (evidence of one negative interaction with K. in December 2018); *see also* R 875, 902-904, 994-996, 999-1001 (evidence of improvement in peer interactions after plan in place).

**Procedural History**

On October 19, 2020, Plaintiffs filed an impartial hearing request alleging that the District had violated § 504 of the RA by discriminating against A.R. when it failed to prevent and appropriately respond to bullying that was discovered by the District and reported to the family on October 23, 2018. After a two-day hearing conducted under the District's impartial hearing procedure, the independent hearing officer ("Hearing Officer") found that the District had not discriminated against A.R. and did not violate § 504.

Plaintiffs sued the District in February 2021 seeking judicial review of the Hearing Officer's decision. Both parties cross-moved for judgment on the administrative record.

## II.

The impartial hearing officer had jurisdiction under 34 C.F.R. § 104.36. This Court has federal question jurisdiction under 28 U.S.C. § 1331.

District courts review claims decided by a hearing officer using a modified *de novo* review.[4] *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). This means that legal determinations get a fresh look, but the hearing officer's factual findings are given "due weight." *Id.* at 269-70.

For the ADA claim that was not resolved by the hearing officer,[5] the Court follows the usual summary judgment standard. *See J.L. v. Lower Merion Sch. Dist.*, 2021 WL 6072815, at *5 (E.D. Pa. Dec. 23, 2021). Summary judgment is appropriate when there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,*

---

[4] District courts are divided on whether the Third Circuit standard requires *de novo* or modified *de novo* review. *See Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*, 799 F. Supp. 2d 473, 482 (E.D. Pa. 2011) (explaining divide). However, reviewing the evidence under either standard yields the same result: the District provided a FAPE. Further, the parties here agree modified *de novo* review is the standard. A.R. Br. at 5; District Br. at 13-14.

[5] There was no process available for A.R. to raise the ADA claim during the administrative process, A.R. Br. at 2 n.1, so A.R. properly raised this claim for the first time in the complaint filed at the District Court.

*Inc.*, 477 U.S. 242, 247-48 (1986). At "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

### III.

**A. The Hearing Officer applied the proper standard to determine if the school violated § 504 of the RA.**

Section 504 of the RA states, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. To prove a claim under this section, A.R. must show four elements: (1) he is "disabled" as defined by § 504; (2) he is "otherwise qualified" to participate in school activities; (3) the program receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at the school because of his disability. *Andrew M. v. Del. Cnty. Off. of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007). The parties do not dispute the first three elements, so only the fourth remains.

As a threshold matter, the Court must decide which standard governs whether A.R. was excluded from participation in, denied the benefits of, or subject to discrimination at the school because of his disability. The standard differs depending on the form of relief sought.

To obtain equitable relief, A.R. needs to show only that he was denied a FAPE. Any denial of FAPE, whether intentional, negligent, or otherwise, is a violation of § 504 that entitles a plaintiff to equitable relief. *Ridgewood Bd. of Ed.*, 172 F.3d 238, 253 (3d Cir. 1999); *see also Centennial*, 799 F. Supp. 2d at 488-89. A school provides a FAPE through the "provision of regular or special education and related aids and services that . . . are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met." 34 C.F.R. § 104.33(b)(1). "[P]roviding a FAPE in accordance with § 504 requires a school district to 'reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits.'" *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253, n.8 (3d Cir. 2012) (citation omitted). Because the statute requires schools to accommodate "*reasonably*," courts should "strike a balance between the rights of the student and [his] parents and the legitimate financial and administrative concerns" of the school. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 281 (3d Cir. 2012) (emphasis added) (citation omitted).

One common form of equitable relief in § 504 cases is compensatory education—a fund to be used for limited educational purposes to place the child in the position he or she would have been in had the school district not denied FAPE in the first instance. *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 608 (3d Cir. 2015). If liability is proven, the child is entitled to compensatory education for a period equal to the period of deprivation. *Id.* at 626.

11

By contrast, to recover monetary damages, a disabled student needs to overcome the added hurdle of showing that the school intentionally discriminated against him. *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. 2013). Proof of deliberate indifference also satisfies the intentional discrimination element. *Id.* at 263.

Here, A.R. seeks only equitable relief and does not seek monetary damages, so the parties agree that he does not need to prove intentional discrimination. A.R. Br. at 13; District Br. at 15-16. But they disagree over whether the Hearing Officer properly applied the correct standard. A.R. argues the Hearing Officer mistakenly held him to the higher standard of proving intentional discrimination because, in laying out the legal standard, he said proof of intentional discrimination was required to "obtain compensatory monetary damages" under § 504. A.R. Br. at 14 (citing R 1100). The District argues that, although the Hearing Officer recognized that a heightened standard applies when a plaintiff seeks damages, he still applied the appropriate standard applicable to equitable relief in deciding this case, as evident by the rest of his opinion. District Br. at 17.

The District is correct that the Hearing Officer applied the appropriate standard to determine whether it denied A.R. a FAPE. The Officer first explained that A.R. would have to show he was either "denied the benefits" of the school's program or "subject to discrimination." R 1100. Then, he noted that A.R. would have to show intentional discrimination "[t]o obtain compensatory monetary damages." R 1100. Although the Officer mentioned the heightened standard, he did not use the intentional-discrimination standard throughout the rest of his decision. He did not discuss deliberate indifference—the standard within this Circuit to show intentional discrimination. Rather, he discussed

12

whether the District had "inadequate protections . . . in place at the time of the incident" and whether it "failed to adequately respond to the October 2018 bullying incident."  R 1102.  These questions speak to whether the District provided reasonable accommodations or, in other words, whether it provided a FAPE.

**B. The Hearing Officer properly determined that the District provided a FAPE.**

The District provided a FAPE in accord with § 504 because it (1) provided reasonable accommodations leading up to the October 2018 bullying incident and (2) responded appropriately to the incident by disciplining the bully and putting anti-bullying accommodations in place to protect A.R.  It thus did all it needed to do to provide a FAPE.

1. <u>The District had reasonable accommodations in place leading up to the October 2018 bullying incident.</u>

To ensure students have access to a FAPE, school districts "have a continuing obligation under . . . § 504 to identify and evaluate all students who are reasonably suspected of having a disability under the statute[]."  *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009).  This means that, leading up to the October 2018, the District had a statutory responsibility to identify, evaluate, and accommodate all reasonably suspected disabilities.  *Id.*  But it was not required to provide accommodations for disabilities not reasonably suspected.  *See id.* at 738-39 (rejecting parents' argument that a school "did not assess [the student's] social and emotional functioning" because "those areas were not identified as suspected disabilities and so were properly excluded" from the accommodation plan).

The Court must determine whether the pre-October 2018 bullying was serious enough to trigger the District's obligation to add anti-bullying accommodations to A.R.'s 504 Plan.[6]  The Department of Education has advised on this issue in a Dear Colleague letter.  *See* A.R. Br. Ex. C ("DOE Letter").  It warned that, in some cases, school districts may violate § 504 if "peer harassment based on . . . disability[7] is sufficiently serious that it creates a hostile environment and such harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees."  *Id.* at 1.  "Harassment creates a hostile environment when the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school."  *Id.* at 2.

In an analogous school bullying case under Title IX, the Supreme Court cautioned courts to "bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults."  *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999).  Elementary-school students "often engage in insults, banter, teasing, shoving, [and] pushing," but the

---

[6] The applicable statute of limitations for a § 504 claim is two years, so the parties agree that pre-October 2018 incidents cannot be the basis for a violation alone.  R 1101.  Yet these earlier events are proper evidence of what anti-bullying protections should have been place at the time of the October 2018 incident.  *Id.*

[7] As noted here, § 504 only requires schools to protect students from harassment based on disability.  It is not immediately clear that the instances of bullying A.R. faced were based on his disability.  *See Dorsey v. Pueblo Sch. Dist. 60*, 215 F. Supp. 3d 1082 (D. Colo. 2016) (discrimination based on bullying where peers called the student "cripple" because of physical disability).  I assume without deciding that the students who bullied A.R. viewed him as a target because of his disabilities, which made it hard for him to fit in socially.

14

behavior must be "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education" before the school is responsible.[8] *Id.* at 652.  The cases A.R. cites as examples a bullying-related denial of FAPE, A.R. Br. at 16, drive home the point that bullying must be severe before it is actionable:

- In *E.M. v. San Benito Consol. Indep. Sch. Dist.*, 374 F. Supp. 3d 616 (S.D. Tex. 2019), the student was a victim of consistent and pervasive harassment in gym class, including verbal harassment, physical harassment that resulted in serious injuries (like a chipped front tooth), and threats of violence that made him afraid to attend school. *Id.* at 621-22.  The school district disregarded the parent's repeated complaints and ultimately dismissed him from the minimal special education services he had received, rather than provide additional necessary supports. *Id.*  The bullying in *E.M.* warranted school intervention because it was "a constant stream of physical harassment inflicted upon [the student] by his peers over a two-and-a-half-year period." *Id.* at 626.

- In *Dorsey*, 215 F. Supp. 3d 1082 (D. Colo. 2016), the student was regularly bullied by a "'mean girls' clique," who called her a "freak" and "cripple" because of her disabilities, choked her, regularly hit her and called it "tasering," and stole the snacks she was allowed to keep with her as part of her 504 Plan. *Id.* at 1085-86.  The nickname "cripple" spread to the rest of the class, and many students harassed her both in class and via Snapchat. *Id.* at 1086.  The bullying was actionable because it occurred "daily" for 8 months. *Id.* at 1089.

- In *Black v. Littlejohn*, 2020 WL 469303 (N.D. Ill. Jan. 28, 2020), the student was physically and orally harassed daily by other students and teachers, who called him "stupid," "dumb," and "retarded" because of his disabilities. *Id.* at *1-2.  They also hit, grabbed, pushed, scratched, and choked him. *Id.* at *1-2.  The constant abuse led to the student to attempt suicide, and that attempt left him with permanent injuries. *Id.* at *2.  The bullying in *Black* warranted school intervention because it "severely affected [the

---

[8] A.R. argues that *Davis* and other cases involving monetary damages are wholly inapplicable to this action for compensatory education. A.R. Reply Br. at 3.  But that is not true.  Under both standards, the peer-on-peer harassment must be serious enough to trigger the school's responsibility to implement accommodations. *See P.P.*, 585 F.3d at 739 (explaining that the "right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education"); *Ridley*, 680 F.3d at 281 (in action for compensatory damages, instructing courts to take into account "the legitimate financial and administrative concerns" of the school).  The difference in the two standards—for compensatory education and monetary damages—comes into play when evaluating the school's response *after* it has a responsibility to act.

15

student's] education" and was "particularly detrimental because it was at the hands of teachers." *Id.* at *8.

Overall, the severity and frequency of the bullying incidents A.R. endured did not rise to the level that required the District to make systematic changes and modify his 504 Plan before the October 2018 incident. The District knew that A.R. was the victim of five prior bullying incidents spread over the course of two school years. These incidents were minor relative to those in the case law cited above because they involved only name-calling or physical altercations that did not result in injury. These bullying incidents were sporadic and isolated, such that the District appropriately handled each instance individually without having to implement a new 504 Plan specifically combatting bullying.

Of course, schools should not ignore isolated instances of name-calling and wait until the bullying becomes life-threatening. Even at early stages before the bullying becomes severe, schools should respond by disciplining the bully and supporting the victim. *See, e.g.*, R 51, 335 (showing how the District responded to the initial isolated bullying incidents). That said, isolated and relatively minor instances of bullying do not trigger a school's statutory duty to create a new 504 Plan. Such a requirement would be administratively infeasible. Instead, the duty to add supports to a 504 Plan is triggered only when the bullying is "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education." *Davis*, 526 U.S. at 652.

Parents highlight, as evidence that the District failed to accommodate appropriately A.R. pre-October 2018, the recommendation for social-skills accommodations that the 504 evaluator made seven months earlier in March 2018. R 282-86. In that recommendation,

the evaluator suggested multiple ways the District could help A.R. improve his social skills, including providing him with assertiveness training and rearranging classroom seating to put him next to someone who may become a friend. R 282-83. The finalized 504 Plan did not include most of these recommendations. R 288-293. Still, the evaluator made this recommendation because A.R. said he felt that he annoyed other people and because Parents said he was "last to be picked for teams." R 274. There was no discussion of bullying in the 504 evaluation. As explained above, the bullying incidents pre-October 2018, though understandably upsetting to A.R. and Parents, did not trigger the school's responsibilities under § 504 of the RA.

2. The District responded appropriately to the October 2018 bullying incident by restricting the offending bully and providing more supports to A.R.

A.R. and Parents next argue that, even if the District did not need to have anti-bullying accommodations in the 504 Plan before October 2018, its poor response to the October 2018 incident was a denial of FAPE. But the school responded quickly, materially, and in a manner reasonably calculated to end the harassment.

Again, the DOE Letter clarifies how schools should respond to a severe bullying incident based on disability discrimination. "If an investigation reveals that discriminatory harassment has occurred, a school must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring." DOE Letter at 2-3. Those steps include "separating the accused harasser and the target, providing counseling for the target and/or

17

harasser, or taking disciplinary action against the harasser." *Id.* at 3.  The District took all three of the recommended steps:

1. First, it separated the harasser K. from A.R..  *See* R 500.  K.'s safety plan involved removing him from A.R.'s class and requiring that he is "never to be in contact with [A.R.] throughout the day."  R 500.  The District changed K.'s class, lunch, and recess to make sure he would not go near Student.  R 500.  It designated a staff person to walk K. to and from activities to make sure he did not approach A.R.  R 500.

2. Second, it provided counseling for the target and the harasser.  For the target, A.R., it provided social-skills sessions, leadership opportunities, weekly check-ins with the school psychologist, and a peer buddy.  R 497.  For the harasser K., it required participation in a bully-prevention program, social-skills sessions, and weekly check-ins with a teacher.  R 500.

3. Third, it disciplined the harasser.  It communicated with K.'s parents, gave K. a one-day suspension, and took away his recess period for one month.  R 498-500.

The District's response worked.[9]  The safety plan to keep K. away from A.R. and the new accommodations for A.R. in his 504 file made a positive difference in his social life.  The record reflects he thereafter socialized well with his peers at recess, lunch, and other times.  R 640-43, 674-75, 901, 988-90.  Other than one negative interaction with K. shortly after the safety plan went into place (which the school addressed quickly by separating the students and disciplining K.), there was no repeat bullying.[10]  *See* R 98, 336, 875 (evidence of one negative interaction with K. in December 2018); R 875, 902-904, 994-996, 999-1001 (evidence of improvement in peer interactions after plan fully in place).

---

[9] It is true that after Grandfield's initial response to the incident, K. retaliated by calling A.R. a "snitch" and threatening him.  R 83.  However, the District's administrators made meaningful and effective changes after Grandfield brought the incident to their attention.

[10] Parents cite some bullying that occurred in late October 2018 shortly after the major bullying incident, R 91, but because this occurred before the full safety plan was in place, it offers no indication of whether the school's interventions were successful.

The District's response was not perfect in all respects, but requiring perfection would place an impossible burden on schools. It followed the DOE Letter's guidance to take "prompt and effective steps reasonably calculated to end the harassment . . . and prevent [it] from recurring." DOE Letter at 2-3. This was sufficient to meet its responsibility under § 504 of the RA.

C. **The ADA claim similarly fails.**

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Although there are some differences between the ADA and RA that are not relevant here, courts use identical FAPE analyses to determine whether a school has violated both statutes. *S.H. ex rel. Durrell.*, 729 F.3d at 260 ("The same standards govern both the RA and the ADA claims."). Here, A.R. bases his ADA claim on a theory identical to his § 504 claim: that the District failed to provide him a FAPE. But because it provided a FAPE, A.R.'s ADA claim must also fail.

\*     \*     \*

For the reasons discussed above, I grant the District's motion for judgment on the administrative record and deny A.R.'s cross-motion. An Order and Judgment consistent with this Memorandum will issue.

Dated: April 18, 2023

/s/ Thomas L. Ambro
Circuit Judge, sitting by designation